Frank J. WSOL, Sr., Hugh M. Corcoran, Robert N. Falco, Neil J. London, Charles Schmalz, Trustees of the International Brotherhood of Teamsters Union Local No. 710 Pension Fund, and the International Brotherhood of Teamsters Union Local No. 710 Pension Fund, Plaintiffs,

v.

GREAT NORTHERN ASSET MANAGEMENT, INC. and East West Institutional Services, Inc., Defendants.

No. 99 C 2004.

United States District Court, N.D. Illinois, Eastern Division.

Sept. 11, 2000.

Stephen Jay Feinberg, Marvin Gittler, Leonard J. Elberts, Margaret Ann Angelucci, Asher Gittler Greenfield & D'Alba, Chicago, IL, David A. Sawyer, Russel N.

Luplow, Gregory R. Schermerhorn, Law Office of Russell N. Luplow, Birmingham, MI, for Plaintiffs.

Assistant U.S. Atty., U.S. Attorney's Office Chicago, IL, Victor A. Wild, U.S. Atty., Boston, MA, for U.S.

Frederick V. Lochbihler, David S. Barritt, Moira Kathleen Metzger, Chapman & Cutler, Chicago, IL, Albert A. Woodward, Geoffrey P. Jarpe, Maun & Simon, PLC, Minneapolis, MN, for Defendant.

### MEMORANDUM OPINION AND ORDER

BUCKLO, District Judge.

In this ERISA case, Great Northern Asset Management ("Great Northern") of Minnesota, an investment advisor to Teamsters Union Local 710 Pension Fund (the "Fund"), of Illinois, used the services of East West Institutional Services ("East West"), a Connecticut corporation located in Michigan and an "introducing broker" of questionable qualifications and disputed resources. East West directed trades through certain clearinghouse brokers in exchange for receiving the lion's share of the commissions on those trades, while kicking back half a million dollars to crooked Fund trustees who, thus bribed, would approve those investments with those clearinghouse firms. Christopher Roach, president of East West, has been indicted, and one of the corrupt Fund trustees, William Close, has pleaded to 20 counts of racketeering, extortion, and money laundering, in connection with the facts underlying this civil case. Great Northern did not disclose East West's shabby background to the Fund: even apart from this conspiracy, Roach, when engaged, had only recently regained the licenses he had lost for misconduct, and East West was undercapitalized and inadequately staffed.

The Fund and named Trustees above (hereafter, the "Fund") sued Great Northern and East West under ERISA for breach of fiduciary duty and engaging in prohibited transactions and for breach of contract under state law. Great Northern moves for summary judgment on the counts in which it is named and to dismiss the related state law claims. I deny the motion.

### I.

In 1995, the Fund picked Great Northern, incorporated in 1994, as its fixed income investment manager, and placed $250 million in its care. This choice was approved by the Fund's Board of Trustees and its investment consultant, Performance Analytics, Inc. Great Northern used East West as an introducing broker to put it in contact with clearing firms. East West represented that it had a larger client base than the relatively new Great Northern, although East West itself was hardly older, and that it was able to offer Great Northern direct access to the trading desks of five clearing firms: Chicago Corp., Capital Institutional Services, Bear Stearns Securities Clearing Corp., Dean Witter, and Rauscher, Pierce & Refsnes. East West was compensated in part under agreements providing for a split of a spread earned by the clearing firms. East West took 80% of the spread for each trade, or over one and a half million dollars total over the period of the arrangement. So far the parties agree: now the stories diverge.

Great Northern says that this arrangement was supposed to "incentivize" the five clearing firms to give Great Northern better execution services, e.g., to make trades promptly when indicated, because major clearing firms like Merrill Lynch that were not introduced by East West tended to be less responsive in responding to price quotes. According to Great Northern, the arrangement with East West did not cause the Fund any loss, but, on the contrary, helped to obtain the best execution of trades for the Fund; and Great Northern maintains that the Fund was apprised of East West's role through July 1995, until the Fund directed Great Northern to stop sending it confirmations of trades.

According to the Fund, however, East West was at best a sham, and at worse a scam. The Fund contends that it received nothing of value from East West, and offers expert testimony [1] that Great Northern would have done just as well or better on trades without East West's "introduction" services; that better known and more established brokers could have done better by the Fund in terms of trades, and with smaller spreads; and that the Fund suffered losses of many hundreds of thousands of dollars due to this arrangement and Great Northern's conduct. The Fund introduced evidence of the following facts that I must accept for purposes of this motion.

Roach, East West's President, had only two years of community college, had been fired for misconduct from Paine Webber in 1991, had lost and only recently regained some necessary licenses, and had been unemployed until he purchased the dormant firm that he made into East West in 1994. The misconduct for which Roach had lost his licenses involved opening an unauthorized account in connection with a scheme concocted in part by the other principal in East West, Richard Tringale, who was found in an SEC-initiated action in 1991 to have defrauded various clearinghouse brokers of hundreds of thousands of dollars.

Moreover, East West was a mailbox operation that owned no office equipment or other assets, did not have its own office space, and had only a few part-time employees apart from Roach and Tringale. Roach testified that the services East-West provided to the Fund, in exchange for the 80% "split," amounted to opening an account with the clearinghouse broker, passing to Great Northern research it received from those clearinghouse brokers, and negotiating the rate to be charged on the trades made in the Fund's accounts. Roach stated to Chuck Lief of Bear Stearns in October 1996 that what he did to get business was to do "a ton of PR

work in telling firms what entities are doing manager searches, provide[ ] introductions, and a lot of schmoozing .... [and] receive[ ] and distribute[ ] research to people" (contact report of Nov. 11, 1999). There was also some evidence that Great Northern received no material directly from East West.

In April 2000, Roach, Tringale, and Close were indicted for a racketeering scheme including charges that they induced Great Northern to direct trades through the five clearinghouse brokers for East West's benefit. Close pleaded guilty to various crimes, including accepting about $500,000 in bribes from Roach and East West to corruptly use his vote on the Fund's Board to approve investment advisors who went along with the East West "split" scheme. As I write, Roach's and Tringale's cases are still pending.

## II.

Summary judgment is appropriate where there is no material issue of fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). I take the facts in the light most favorable to the party opposing the motion, *Fulk v. United Transp. Union,* 160 F.3d 405, 407 (7th Cir.1998), but the nonmoving party has the burden of coming forward with enough evidence so that a rational jury could find for it at trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### A.

It is undisputed that Great Northern was an ERISA fiduciary, required by law to "discharge [its] duties with respect to a plan solely in the interest of the ... beneficiaries for the exclusive purpose of providing benefits to participants ... and defraying reasonable [administrative] expenses, [acting] ... with the care, skill, prudence, and diligence ... that a pru-

---

1. Great Northern challenges the admissibility of the testimony of the Fund's experts as unreliable. I address this question below.

dent man ... would use...." 29 U.S.C. § 1104(a)(1)(A) & (B). According to the Fund, Great Northern violated this duty, first, by paying hundreds of thousands of dollars to East West and receiving nothing in return but setting up accounts at three clearinghouse brokers, a task that Roach says was so simple that "a monkey" could do it, and performing a couple of other simple jobs; and second by engaging East West for this job at all, something no prudent person would do if he had properly investigated, and moreover, failing to inform the Fund trustees about the brokerage fees paid to East West and paying a referral fee to East West with Fund assets.

■ Great Northern responds, essentially, "no harm, no foul." It argues that whatever it did or did not do, the Fund was not injured financially. There is ERISA liability only for "any losses to the plan resulting from each such breach...." 29 U.S.C. § 1109. Without a showing of self-dealing or a breach of the duty of loyalty, there must be economic loss caused by the fiduciary's misconduct for a recovery. See Mira v. Nuclear Measurements Corp., 107 F.3d 466, 473 (7th Cir. 1997) (no monetary recovery unless the plaintiff has suffered harm).

Great Northern argues that its arrangements with East West did not involve a breach of the duty of loyalty because it was not paid anything of value by East West, nor did East West affect the Fund's decision to retain Great Northern as its financial manager. Great Northern says that it may not have cottoned to how crooked and incompetent East West was, but it did its own job well and arranged for the best execution of the trades it made for the Fund. Even if it breached its duty of care in some respect, it did not breach its duty of loyalty, and there was no harm done. In short, it was at worst a sucker, but a lucky sucker, happily for the Fund.

■ The Fund argues that this is hard to believe, and I agree. With all the reputable choices for financial advice available, I do not see how any supposedly professional outfit as Great Northern represents itself to be could make an arrangement with a dubious, unqualified, understaffed and undercapitalized (never mind corrupt) outfit like East West that had no track record and no reasonable prospects, and where there is plausible evidence that East West did worse on its trades for the Fund than did other Great Northern clients (see below). Great Northern's managers represent themselves as highly qualified, experienced, and able, and it might raise a darker inference than mere negligence for people like that to deal with the likes of Roach and Tringale. Great Northern's story that it was a new start-up that needed East West's contacts is doubtful: East West was not much older, and its principals were grossly unqualified persons of questionable integrity.

Moreover, a jury might be skeptical that Great Northern needed an introducing broker to get clearinghouse brokers to trade T–Bills, not exactly sophisticated transactions, when it got these directly from clearinghouse brokers for other clients, and when its business would have been attractive to those brokers in any case. It's not as if Great Northern had never heard of Bear Stearns or Dean Witter, or that such firms would turn up their noses at investing $250 million in pension funds. A rational jury might find that Great Northern's story did not add up.

■ No particularized allegations about what might have happened are made, but this is not a fraud claim governed by Fed. R.Civ.P. 9(b). ERISA breach of fiduciary duty claims "can generally be pleaded in two ways: fraud and breach of the written plan agreement ..." Radiology Center, S.C. v. Stifel, Nicolaus & Co., 919 F.2d 1216, 1221 (7th Cir.1990). The Fund has chosen the second approach, and so the sort of particularity required in a fraud case, the "who, what, when, where, and how: the first paragraph of any newspaper story," DiLeo v. Ernst & Young, 901 F.2d 624, 627 (7th Cir.1990), is not required here.

Even more crucially, the Fund's experts concluded that Great Northern was calling the shots with East West, and this is plausible given that East West was essentially a two person maildrop, and not two impressive persons at that. By itself, calling the shots with an introducing broker might be okay, but in view of the evidence of East West's involvement in a criminal conspiracy, an inference might be raised that it was not okay. Such an inference would not be compelled, but it would be permitted. Such an inference might not be beyond a reasonable doubt, but a rational jury might find that these facts would support a verdict that more likely than not there was self-dealing by Great Northern. In that case, no showing of economic loss would be required for the Fund to recoup Great Northern's profits from the arrangement and the Fund's own costs in the matter.

## B.

■■ I now turn to whether there was economic loss. If a rational jury could so find, Great Northern may be liable even if it did not breach its duty of loyalty. Great Northern introduces some evidence that it did right by the Fund in any case. Great Northern defends itself on the issue of loss rather more than breach.[2] There is an affidavit by one of its officers, Richard Halverson, a Harvard M.B.A., that it obtained "best execution" (executing the customer's order at the best available price) through standard business techniques. This is obviously self-serving and carries little weight. *See Gramatikov v. I.N.S.*, 128 F.3d 619, 620 (7th Cir.1997) (discounting self-serving testimony); *United States v. Nobles*, 69 F.3d 172, 181 (7th Cir.1995) (same). More persuasive is the testimony of the Fund's administrator, Brian O'Malley, that he was satisfied with Great Northern's performance. But that single statement does not in fact support the claim that Great Northern obtained best execution or that there was no loss, just that the results were satisfactory to O'Malley. Finally, Great Northern offers the expert testimony of Stuart McCrary, a Northwestern M.M., based on a statistical analysis, that Great Northern's arrangement with East West, and East West's with the five clearinghouse brokerages, did not cost the Fund any money. McCrary does not, however, testify that Great Northern obtained best execution for the Fund.

For its part, the Fund offers the expert testimony of Stephen Berkowitz, who has a Penn M.B.A., and Michael Mayer, who has a Northwestern M.B.A. and is a Chartered Financial Analyst and a Certified Fraud Examiner, that Great Northern failed to obtain the lowest possible trading costs for the Fund, "as the vast majority of the fixed income spreads ended up benefitting a third-party broker—East West—that provided nothing of value to the pension fund," as Mayer put it, concluding from comparison with the actual performance of the portfolios Great Northern managed and with bond indices in the relevant period that the Fund would have earned about $300,000 on the commission dollars diverted to East West,[3] not counting investigation costs. Berkowitz concluded that Great Northern obtained disadvantageous

---

2. The main point on which Great Northern challenges the Fund's claim that there was a breach of the duty of care was that Great Northern did notify the Fund that its trades had been "introduced" through East West on the monthly statements it provided in 1995 until the Fund told it not to send them. However, I think the facts about East West and its principals would require a fiduciary to disclose more than the name and the fact of the introducing broker relationship. If Great Northern thought that East West was suitable despite its questionable resources and personnel, it should have explained the facts in detail to the Fund. *See* Mary O. Jensen, Comment, *Separating Business Decisions and Fiduciary Duty in ERISA Litigation?* 10 B.Y.U. J.Pub.L. 139 (1996) (arguing for an extensive duty to disclose considered plan changes to participants).

3. The Fund claims more than a half million dollars in damages, but since there is evidence these are substantial in any case, the exact amount is a question for trial.

prices due to the criminal conspiracy involving Roach, Tringale, and Close.

■ Great Northern challenges the admissibility of the Fund's experts' testimony under *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) (holding that under Fed.R.Evid. 702, expert testimony must be reliable to be admissible). Evidence that is inadmissible because it is unreliable under *Daubert* cannot be used to oppose a summary judgment motion. *Porter v. Whitehall Laboratories*, 9 F.3d 607, 612 (7th Cir.1993). In *Daubert*, the Supreme Court indicated four factors that bear on reliability: (1) the testability of the hypothesis; (2) whether the theory or technique has been subject to peer review and publication; (3) the known or potential rate of error; and (4) whether the technique is generally accepted. 509 U.S. at 593–94, 113 S.Ct. 2786.

Great Northern attacks Berkowitz's and Mayer's qualifications, but these individuals are at least as qualified as Great Northern's own expert, McCrary. It also objects that Mayer's report improperly involves legal conclusions, but to the extent that Mayer refers to elements of a cause of action, he is within his limits: what matters is his factual basis for stating whether these elements are satisfied. I naturally determine for myself what the law is and how it applies to the facts for the purposes of this motion.

The real issue raised by Great Northern is whether the Fund's experts have based their conclusions on a peer-tested methodology. Great Northern argues that these experts could not have reasonably concluded that there was a loss from comparing the prices charged on ten of Great Northern's transactions for the Fund on a single day with the prices charged to others on that day because prices are volatile—essentially the argument is that the sample was no good and the experts failed to control for sources of error. But that is not an accurate characterization of the Fund's experts' approach, which was rather to compare the transactions made on the same date over about three years for a number of different Great Northern clients made through other brokers. The Fund's experts also used comparison with bond indices in the relevant period. The analysis indicated that Great Northern's and East West's other clients consistently did better than the Fund. I am not sure how else one would analyze the question. Great Northern argues, further, that its own expert's statistical analysis shows that the difference in trading costs was not statistically significant, but that tends to create a material issue of fact rather than to show there is nothing for a jury to decide.

The defendants argue that no loss can be attributed to the lack of a commission recapture agreement between Great Northern and East West (essentially a rebate for granting the introducing broker rights over a portfolio), but what the Fund's experts claim is that an introducing broker is normally used to provide either commission recapture, research, or some other benefit, and East West provided none of the usual benefits of the introducing broker arrangement, whether a commission recapture by Great Northern or anything else, and cost more than similar relations with other clients of Great Northern, whether involving introducing brokers or not. Therefore, the Fund's experts concluded that the arrangement was a source of loss. I agree that a rational jury could so find.

■ The methods of the Fund's experts are standard, so generally accepted. They are Mill's Methods of Co-variation and Difference, *see* John Stuart Mill, *A System of Logic* 160ff (8th ed., Harper & Bros. 1874)—there are bad trades with East West, and better trades with others over a period of years. These methods are fundamental to scientific research, arguably partially constitutive of it, and accordingly have been peer reviewed and published (not least by Mill), and are in general reliable. Whether they led to the right

result here is a matter for the jury, but the Fund's experts' testimony is admissible.

Finally, Great Northern refers me to the findings of another judge of this court in a similar case involving the Fund, *Wsol v. Fiduciary Management Associates, Inc.,* 99 C 1719 (N.D.Ill. Jan. 25, 2000) (trial transcript), where Judge Conlon found that another firm, the defendant there, that also invested pension monies for the Fund and had a similar arrangement with East West, had not breached its fiduciary duties and had generally got its money's worth from East West. Judge Conlon did not find Berkowitz's testimony persuasive. Although Great Northern complains that the Fund does not address these findings, it is not clear to me what its relevance is. Neither the facts nor all the parties are the same. There is no defensive nonmutual collateral estoppel here. The evidence is different. It matters, too, that the criminal conspiracy to which the Fund's experts attribute some of the loss was unknown to Judge Conlon but is now partly exposed.

### C.

The rest of Great Northern's arguments can be addressed briefly. Great Northern does not state directly that it did not engage in prohibited transactions, although it asserts that there is no evidence that it did commit self-dealing or put Fund assets at risk for its own ends. I have already concluded that this is not true: the details of what, if anything, Great Northern might have done remain opaque, but there is enough circumstantial evidence for a rational jury to conclude that it more likely than not engaged in some sort of self-dealing and may have committed prohibited transactions. At least, Great Northern's unsubstantiated assertions cannot carry a summary judgment motion on this point in the face of actual evidence brought forward by the Fund.

Because I decline to dismiss the ERISA claims, the argument that I should dismiss the state law claims for lack of supplemental or diversity jurisdiction is moot. Great Northern might have argued that those claims are preempted by ERISA, *see* 29 U.S.C. § 1144 (ERISA preempts "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan."). Perhaps it did not bother because it knew that even if the contract claims were preempted, I would have just have analyzed the contract under ERISA standards rather than state law standards.

### III.

I DENY Great Northern's motion for summary judgment and to dismiss the related state law claims. Other pending motions to strike evidence as hearsay are DENIED as moot.